| | | |
|---|---|---|
| BETTY BRIDGEWATER and JERRY P. WILLIAMS, Individually and on behalf of a Class of All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:09-CV-1758-B ECF |
| DOUBLE DIAMOND-DELAWARE, INC., et al., | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Class Certification filed December 17, 2011 (doc. 95). For the reasons set forth below, the Court finds that the Motion should be and hereby is **DENIED**.

## I.

## FACTUAL BACKGROUND[1]

Plaintiffs Betty Bridgewater and Jerry P. Williams (collectively "Bridgewater" or "the Plaintiffs") filed this class action suit on behalf of all property owners in the White Bluff Resort at Lake Whitney ("White Bluff") alleging that the Defendants, who developed, managed, or marketed the White Bluff properties, fraudulently assessed fees on property owners in violation of the federal RICO statute, 18 U.S.C. § 1962(c) and (d), and Texas law. The White Bluff Resort includes over

---

[1] The Court takes its factual account from Plaintiffs' First Amended Complaint ("FAC") filed October 10, 2010.

6,000 lots near Lake Whitney, Texas and the plaintiff class includes all White Bluff current and former property owners who from January 2004 to the present paid the challenged assessments.

Defendant Double Diamond-Delaware, Inc. is a privately-held, for-profit company in the business of resort development that operates in Texas through its affiliated Texas corporation, Double Diamond, Inc. (collectively "Double Diamond").[2] Double Diamond purchases large tracts of undeveloped property, which it subdivides into lots that are marketed and sold to individuals as investment or retirement property, including the White Bluff planned community.[3] Purchasers of Double Diamond property are not obligated to build on or improve their lots,[4] but they are required, as a condition of ownership, to become members of the White Bluff Property Owners' Association ("the WBPOA"). As owners and members of the WBPOA, the Plaintiffs in this action were required to pay annual dues to the property owners' association and were subject to the recurring mandatory assessments at the foundation of this dispute. Plaintiffs describe what they contend to be a scheme for improperly assessing the WBPOA for expenses incurred by other Double Diamond entities and misrepresenting the need for and use of those funds.

Double Diamond established subsidiaries (also defendants) to own and operate resort amenities at White Bluff. The amenities include "two 18-hole golf courses, the Lighthouse restaurant, a spa, The Inn, and a marina, all of which are owned by Double Diamond through one

---

[2] The Court uses the term "Double Diamond" to refer both to the Double Diamond entities as well as all Defendants collectively.

[3] Double Diamond has also acquired and marketed property, following a similar business model, in three other locations in Texas and one in Pennsylvania. Only the property and assessments related to White Bluff are at issue in this suit.

[4] Of the approximately 6,000 lots in the White Bluff Resort, 600-700 homes have been constructed.

of its subsidiaries." FAC ¶ 22. Many of Bridgewater's claims are rooted in the alleged transfer of funds from the WBPOA to various Double Diamond entities and other allegedly improper assessments levied by the WBPOA for the benefit of those entities.

The WBPOA was formed as a nonprofit association in 1990 pursuant to a filing made by Defendant R. Mike Ward, who was also an officer of Double Diamond. Plaintiffs allege that the "WBPOA is currently, and always has been, controlled by Double Diamond" and that "Defendants Ward and [Fred] Curran have been directors of the WBPOA since its inception, while simultaneously holding positions as officers of Double Diamond." *Id.* at ¶ 25. The WBPOA, not a defendant in this action, is governed by a board of six directors, three of which were Double Diamond officers from the Board's inception until May 2010, and the remaining directors "are hand picked by Ward." *Id.* Plaintiffs allege that Double Diamond has maintained control of the WBPOA through a 1997 agreement that gave Defendant Ward the right to cast the deciding vote in the event of a deadlock and through Mr. Ward's decisive influence in choosing the property owners who fill the remaining three seats on the WBPOA board. Plaintiffs also allege that Double Diamond has taken a number of other steps to maintain its dominance over the WBPOA board, such as changing the date and time of the annual meeting, aggressively opposing and punishing any attempt to fill seats on the board with candidates other than those chosen by Ward, manipulating proxy contest rules, and amending the WBPOA bylaws to require a 2/3 majority to remove a director, "as opposed to a simple majority standard that had been in place for twenty years," without notice to or input from the WBPOA membership. *Id.* at ¶ 34. Further, "[o]n more than one occasion, Double Diamond has sued members of the WBPOA for defamation when members engaged in activities that publicly

criticized the actions of the WBPOA board, Double Diamond and/or Defendant Ward."[5] *Id*. at ¶ 31. Plaintiffs allege that these actions were part of a broader scheme by Double Diamond to maintain control of and use the nonprofit WBPOA to generate revenue for its other business interests, which are the exclusive service providers or owners of amenities at the resort. Double Diamond carried out the "illegal assessment scheme," Plaintiffs allege, "in connection with the conduct" of a RICO enterprise consisting of the board of directors of the WBPOA, Defendants Ward and Curran, and Double Diamond. *Id*. at ¶ 88.

A.      *The Challenged Assessments and Transfers*

Plaintiffs allege that the scheme to assert Double Diamond's control over the WBPOA board resulted in a series of assessments and fees that were used for purposes of enriching Double Diamond or Ward instead of the purposes authorized by the WBPOA's bylaws. Through these assessments, the WBPOA collected approximately $3,500,000 in 2009 alone. Many of the assessments and fees ostensibly supported the "hospitality program," including a mandatory "food and beverage" assessment program.[6] The hospitality program was announced by letter in January 2004 as a means to fund the amenities at White Bluff more through the assessment of the members of the WBPOA and less through the funds raised by selling the remaining parcels of undeveloped real estate. Plaintiffs allege that the representations set forth in the letter to the WBPOA membership were

---

[5] One such suit, against WBPOA member Daniel Saturn, is discussed in Section I(B), *infra*. In response to a defamation lawsuit, Saturn raised counterclaims for, among other relief, a declaration that certain of the assessments levied by the WBPOA were invalid.

[6] The assessment is related to and sometimes referred to as a "food and beverage credit" or "hospitality credit." Under the program, a member is required to pay semi-annual assessments and would in return be granted a "credit" to be redeemed upon purchase of certain amenities at the White Bluff Resort, such as the golf course, restaurants, hotel, or spa.

false, and that the assessment of fees on WBPOA members to pay the costs incurred by other Double Diamond entities was also improper under both Texas law and federal tax law. In 2006, the WBPOA entered into a "Capital Improvement Agreement" with Double Diamond that extended the hospitality program for ten years, agreed to pay the assessment proceeds to Double Diamond, and ended a revenue sharing agreement under which Double Diamond had previously remitted funds to the WBPOA. Plaintiffs allege that the WBPOA's funds were paid to Double Diamond entities, in part, through annual "allocations" of approximately $500,000 each, for which no contract existed.

In addition to the hospitality and "food and beverage" assessments, Plaintiffs challenge and seek to recover assessments made for golf course maintenance costs. Because the golf courses are not property of the WBPOA (they are owned by White Bluff Golf, Inc., a subsidiary of Double Diamond), Plaintiffs allege that it is improper to impose the costs on the members of the WBPOA, especially considering that Double Diamond receives 100% of the revenue generated by the golf courses and the WBPOA pays 100% of the maintenance expenses. Plaintiffs also challenge various other payments to Double Diamond entities made by the WBPOA which they argue are not arm's length transactions but rather further examples of self-dealing by Double Diamond and the individual defendants.

B.      *The State Court Lawsuit*

On June 15, 2009, the 68th Judicial District Court of Dallas County entered final judgment in Cause No. DC-07-12490, *Double Diamond, Inc. and White Bluff Property Owners' Association v. Daniel Saturn* (the "State Court Action"). In that suit, Double Diamond and the WBPOA alleged various defamation and business disparagement claims after Daniel Saturn ("Saturn"), a property owner, attempted to organize a group of dissatisfied property owners to complain about the actions

of Double Diamond and the WBPOA. Double Diamond and the WBPOA also sought to recover unpaid food and beverage assessments from Saturn.

Saturn responded with counterclaims challenging the validity of the food and beverage assessments. Each side sought declaratory judgment "on the propriety of the food and beverage assessments." FAC ¶ 69. Following a jury trial, the Court entered judgment for Saturn, finding that the food and beverage assessments were "not in accordance with the bylaws of the White Bluff Property Owners' Association" and that "assessing mandatory food and beverage assessments from [WBPOA] members and paying such assessments to Double Diamond, Inc. and/or its related companies without such payments being reasonable compensation for services provided to the White Bluff Property Owners' Association, Inc. violates Article 1396-2.24 of the Texas Non-Profit Corporation Act." *Id.* at ¶ 70 (citing FAC Ex. A). The court declared the food and beverage assessments to be "void *ab initio* only as to the parties to" the state court lawsuit. *Id.* The state court action did not resolve questions related to the other challenged assessments. As a result of information obtained through discovery and trial of the state court action, Bridgewater filed this action on September 22, 2009, asserting claims on behalf of all property owners in the White Bluff Resort alleging claims under RICO and state law.

On Double Diamond's and the WBPOA's appeal, the appellate court affirmed the trial court's judgment that Double Diamond and the WBPOA take nothing on their claims against Saturn. *Double Diamond, Inc. v. Saturn*, --- S.W.3d ----, 2011 WL 1240096 (Tex. App–Dallas Apr. 5, 2011). However, the appellate court reversed the trial court's declaratory judgment for Saturn and its award of attorney's fees to Saturn, rendered judgment that Saturn take nothing on his claims for declaratory judgment, and denied Saturn's application for a permanent injunction. The appellate

court explained that the jury answered "No" to the jury question regarding reasonable compensation, which asked in relevant part, "Are the food and beverage assessments collected by the White Bluff Property Owners' Association and paid to Double Diamond, Inc. and/or its related companies reasonable compensation for services rendered to or for the White Bluff Property Owners' Association related or pertaining to one or more of the Association's purposes?" *Id.* at *4. The court explained that Double Diamond "failed to conclusively establish that the food and beverage charges paid" to White Bluff Club Corp., the owner of the hospitality operations and a subsidiary of Double Diamond, "were reasonable compensation for services rendered to the Owners' Association by Club Corp.," and the jury's "No" answer was "not so contrary to the evidence as to be clearly wrong and unjust." *Id.* at *5. The court further explained:

> The jury's answer is an affirmative finding that appellants did not carry their burden of proof to show the food and beverage program complied with the bylaws because the charges constitute reasonable compensation, but it is *not* an affirmative jury finding that [Saturn] carried his burden of proof to show that the food and beverage program violated the bylaws because the charges did not constitute reasonable compensation.

*Id.* at *7 (emphasis in original).

## II.

## PROCEDURAL HISTORY

This Court ruled on Double Diamond's Motion to Dismiss, filed October 16, 2009, on May 10, 2010, granting Double Diamond's Motion to the extent that it sought dismissal of Bridgewater's claim for "conspiracy/aiding and abetting" against all Defendants. The Court denied the Motion to the extent that it sought dismissal, or alternatively a stay, of Bridgewater's claims based on a parallel state court action, and denied the Motion to the extent that it sought dismissal of the RICO,

reimbursement, breach of fiduciary duty, and misapplication of fiduciary property claims.[7] Plaintiffs filed their amended complaint on October 12, 2010. The First Amended Complaint sought "to augment the factual allegations to include matters that took place after the suit was filed . . . and to add two parties," National Resort Management Corp. and United Equitable Mortgage. Mot. for Leave to File Oct. 8, 2010 at 2. The First Amended Complaint also added a new Count, "Injunctive Relief," and omitted the "misapplication of fiduciary property" and conspiracy claims. Plaintiffs filed their Motion for Class Certification on December 17, 2010, and the Court held a hearing on the Motion on February 15, 2011.[8]

## III.

## LEGAL STANDARD

"A district court must conduct a rigorous analysis of the [Federal Rule of Civil Procedure 23 ("Rule 23")] prerequisites before certifying a class." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). The burden of proof rests with the party seeking certification. *See Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003). The trial court's inquiry is a procedural one, focusing on whether Rule 23 is satisfied; "[c]lass certification hearings should not be mini-trials on the merits of the class or individual claims." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). The court may look beyond the pleadings if necessary, however, to "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination

---

[7] Although Double Diamond sought dismissal or a stay of all claims under the *Colorado River* doctrine, it did not specifically seek dismissal of Count Six, "Constructive Trust", and Count Seven, "Unjust Enrichment" of the original Complaint filed September 22, 2009, and the Court did not reach the issue of whether these were appropriate claims.

[8] The Court requested additional briefing on Plaintiffs' standing and this Court's jurisdiction after the class certification hearing, and this briefing was received on April 1, 2011.

of the certification issues." *Castano*, 84 F.3d at 744.

Under Rule 23(a), plaintiffs seeking certification bear the burden of meeting the Rule's requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. FED. R. CIV. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Courts deciding whether to grant class action certification must conduct a rigorous analysis to insure that each of Rule 23(a)'s requirements have been met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Further, plaintiffs also bear the burden of showing that the proposed class action meets at least one of the Rule 23(b) requirements. FED. R. CIV. P. 23(b); *Amchem*, 521 U.S. at 614. Before a class may be certified under Rule 23(b)(3), "a court must also determine that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members' and that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'"[9] *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting FED. R. CIV. P. 23(b)(3)). "The predominance and superiority requirements are 'far more demanding' than is rule 23(a)(2)'s commonality requirement." *Id.* (quoting *Amchem*, 521 U.S. at 624). A determination of whether legal issues common to the class predominate over individual issues requires the court to inquire how the case will be tried. *Id.* (citing *Castano*, 84 F.3d at 744). As explained by the Fifth Circuit,

> This [inquiry] entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. Although this inquiry does not resolve the case on its merits, it requires that the court look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law." Such an understanding

---

[9] Because Plaintiffs seek certification under Rule 23(b)(3), the Court does not examine whether Plaintiffs' proposed class could or would qualify for certification under Rule 23(b)(1) or Rule 23(b)(2).

prevents the class from degenerating into a series of individual trials.

*Id.* (citing *Castano*, 84 F.3d at 744). Further, to predominate, common issues must form a significant part of the individual cases. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir.1999) (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)).

## IV.

## ANALYSIS

A.     *Standing*

Prior to determining whether the Rule 23 requirements are met, a court must determine whether the plaintiffs have standing to bring their claims. *O'Sullivan*, 319 F.3d at 742-43 ("As an inherent prerequisite to the class certification inquiry, [the court] must determine whether plaintiffs have a valid cause of action under Texas law and whether they have stated an injury-in-fact.") (citing *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002)); *see also Rivera*, 283 F.3d at 319 (before the certification inquiry, the court "must decide standing first, because it determines the court's fundamental power even to hear the suit") (citation omitted). In order to establish standing, "the plaintiff must have suffered an injury in fact, there must be a causal connection between the injury and the conduct complained of, and it must be likely that the injury will be redressed by a favorable decision." *Rivera*, 283 F.3d at 318 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61). Although the Court previously determined that Plaintiffs did have the required standing in its Memorandum Opinion of May 10, 2010 ruling on Double Diamond's Motion to Dismiss, the Court revisits its previous findings in light of new case law and also to fulfill its duty to conduct a "rigorous analysis" in ruling on a class certification motion.

i.      Standing: RICO Claims

This Court previous found that Bridgewater had standing to assert RICO claims against

Double Diamond. After citing the standing test set forth in *Ocean Energy II, Inc. v. Alexander &*

*Alexander, Inc.,* 868 F.2d 740, 746 (5th Cir. 1989), the Court explained:

> Defendants challenge the ability of the Complaint to satisfy the statutory standing
> requirements, arguing that Plaintiffs have not alleged injury "by reason of" the
> commission of RICO predicate acts. Defendants contend that Plaintiffs[] have not
> alleged that their injuries were the factual and proximate result of the alleged
> predicate acts. Defendants also argue that Plaintiffs "lack standing to assert their
> RICO claims because they lack standing to assert the underlying statutory violations
> [of the Texas Non-Profit Corporation Act] which are necessary to show that the
> assessments are 'illegal.'"
>       Upon review, the Court concludes that Plaintiffs have . . . sufficiently pleaded
> that they were injured "by reason of" the predicate acts of mail and wire fraud.
> Plaintiffs have standing "if, and can only recover to the extent that, he has been
> injured in his business or property by the conduct causing the violation." The statute
> confers standing on "any person injured in his business or property by reason of a
> violation of section 1962 of this chapter." Plaintiffs are not required to plead that
> they relied on the allegedly fraudulent material; rather they are only required to
> allege that they were injured "by reason of" commission of the predicate acts. Here,
> Plaintiffs assert their own injuries; apart from any injury to the WBPOA, they allege
> that they were individually and directly injured by the fraudulent assessments that
> resulted from the alleged racketeering activity. They assert that the alleged predicate
> acts of mail and wire fraud caused them to pay specific assessments and fees. Taken
> as true, Plaintiffs allegations satisfy RICO's statutory standing requirements.

Mem. Op. May 10, 2010 at 22-23 (citing, *inter alia*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S.

639, 658-59 (2008)). The Court therefore denied Double Diamond's motion to dismiss on the

asserted ground that the Complaint failed to properly allege standing.

The day after the Court issued its opinion on Defendants' Motion to Dismiss, the Fifth

Circuit issued its opinion in *Joffroin v. Tufaro*, 606 F.3d 235 (5th Cir. 2010), dealing with RICO

claims asserted by property owners in connection with allegations that a developer and the

developer's corporate officers controlled the property owners' association and were illegally profiting

11

from association funds. Double Diamond now argues, in addition to reasserting prior arguments, that application of *Joffroin* defeats Plaintiffs' motion for class certification as to the RICO claims due to Plaintiffs' lack of standing. In *Joffroin*, the appellants, members of a homeowners' association, sued the developers of their subdivision and the developer's corporate officers, arguing that they controlled the homeowners' association, neglected common areas, and diverted the homeowners' assessments for their own benefit. *Id.* at 236-37. Specifically, the homeowners alleged that the construction company overcharged the association and the developer's "procurement procedure was deficient, preventing the [association] from taking advantage of competitive bidding for various services, and that the [association] paid more for a trash contract granted to a company employing [a corporate officer's] relatives than it otherwise would have." *Id.* at 237. The homeowners alleged that the defendants engaged in racketeering activities in violation of RICO, and they sought treble damages for assessments paid that were diverted for the developer's use and not utilized for the maintenance of the common areas or diverted for work performed for the developer's other entities. *Id.* The homeowners also sought treble damages for contracts procured that were not in the interest of the homeowners' association as well as any kickbacks for such contracts. *Id.* The trial court dismissed the RICO claims after finding that the homeowners alleged injuries that derived from injuries to the homeowners' association, and therefore they lacked standing to bring a direct suit. *Id.*[10] The Fifth Circuit then set forth the test to determine whether the homeowners had standing under RICO to assert their claims, explaining:

---

[10] The Court notes the factual similarity between the facts alleged and claims asserted in *Joffroin* and in the instant case but recognizes that *Joffroin* applied Louisiana state law.

> Where, as here, RICO plaintiffs bring claims analogous to shareholder derivative claims, we apply a three-party test to determine whether the plaintiffs satisfy general standing requirements. We ask (1) whether the racketeering activity was directed against the corporation; (2) whether the alleged injury to the shareholders merely derived from, and thus was not distinct from, the injury to the corporation; and (3) whether state law provides that the sole cause of action accrues in the corporation. If each of these questions can be answered, "yes," then the [plaintiffs] do not have the requisite standing.

*Id.* at 238 (citing *Ocean Energy II*, 868 F.2d at 745; *Whalen v. Carter*, 954 F.2d 1087, 1091 (5th Cir. 1992)). The Court then affirmed the trial court's finding that the homeowners had no standing under RICO, explaining that the defendants directed their alleged racketeering activity against the association, the injury to the homeowners merely derived from, and was not distinct from the injury to the association, and the sole cause of action accrued in the homeowners' association, based on its examination of cases applying Louisiana state law. *Id.*

Applying the factors as set forth in *Joffroin*, the Court finds that Plaintiffs have adequately pleaded standing under RICO. Bridgewater and Double Diamond both make both make colorable arguments regarding whether the racketeering activity was directed against the homeowners' association and whether the alleged injury merely derived from the injury to the homeowners' association, and the Court declines to determine which side is correct at this time.[11] However, the Court's examination of cases shows that Texas state law does *not* provide that the sole cause of action accrues in the homeowners' association, such that plaintiffs alleging injury to the homeowners' association must assert claims through derivative suits. Indeed, it is not clear whether

---

[11] Double Diamond has raised and continues to raise arguments that Plaintiffs do not have standing under RICO as it argues that the harms alleged were suffered by the homeowners' association. The Court declines at this time to disturb its previous finding, as set forth in its May 10, 2010 opinion, that Plaintiffs had sufficiently pled RICO violations based on injuries suffered by them personally.

a derivative suit mechanism for nonprofit corporations even exists under Texas state law.

In support of their assertion that the sole cause of action accrues in the property owners' association, Double Diamond cites to numerous cases applying Texas state law to for-profit corporations governed by the Texas Business Corporations Act. However, these cases appear only partially applicable to the instant case. Under Texas law, claims asserting injury to a for-profit corporation must be brought through derivative suits as set forth by the Texas Business Corporations Act.[12] However, as explained by one state appeals court, there is no such parallel section in the Texas Non-Profit Corporations Act.[13] *Flores v. Star Cab Coop. Ass'n*, 2008 WL 3980762, at *7 (Tex. App–Amarillo Aug. 28, 2008) (recons. overruled Oct. 22, 2008). The *Flores* court examined previous cases where courts assumed the existence of a derivative suit mechanism for nonprofit corporations, *Mitchell v. LaFlamme*, 60 S.W.3d 123 (Tex. App.–Houston 2000, no pet.) and *Governing Board v. Pannill*, 561 S.W.2d 517 (Tex. Civ. App.–Texarkana 1977, writ ref'd n.r.e.) and

---

[12] Indeed, the case law is replete with statements by Texas courts that the sole remedy for wrongs done to a corporation governed by the Texas Business Corporations Act that may be asserted by shareholders is a derivative suit brought on behalf of the corporation. Similarly, cases analyzing claims by shareholders for breach of fiduciary duty by directors governed by the Business Corporation Act also state that such claims must be brought through derivative suits. *See, e.g., Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (corporate stockholder cannot recover damages personally for wrong done solely to the corporation, even though he may be injured by that wrong); *Grinnell v. Munson*, 137 S.W.3d 706, 718 (Tex. App.–San Antonio 2004) (right to proceed against officer of corporation for breaching fiduciary duty owed to the corporation belongs to the corporation itself).

[13] On January 1, 2010, the Texas Business Organizations Code replaced, *inter alia*, the Texas Business Corporations Act and the Texas Non-Profit Corporations Act. *See, e.g.,* http://www.sos.state.tx.us/corp/boc.shtml (last visited April 20, 2011); *see also In re Aguilar*, --- S.W.3d ---- WL 1402848, at *2 n.3 (Tex. App.–El Paso Apr. 13, 2011). Business Organizations Code § 1.008(d) provides that "[t]he provisions of Chapters 20 and 22 and the provisions of Title 1 to the extent applicable to nonprofit corporations may be cited as the 'Texas Nonprofit Corporation Law.'" The Texas Business Organizations Code also does not provide a derivative suit mechanism for nonprofit corporations but provides for derivative proceedings as to for-profit corporations. *Compare* Tex. Bus. Org. Code § 22.001 *et seq* (nonprofit corporations) *with* §§ 21.551-21.563 (derivative proceedings for for-profit corporations). The Court refers the Texas Non-Profit Corporation Act and the Texas Nonprofit Corporation Law interchangeably.

explained that these courts did not decide whether members of a Texas nonprofit corporation may bring a derivative action on behalf of that corporation. *Id.* The Court further explained that the Texas Non-Profit Corporation Act, unlike the Texas Business Corporation Act, does not specifically provide for derivative suits brought on behalf of the nonprofit corporation.[14] *Id.* (citing former Tex. Bus. Corp. Act Art. 5.14(I). Given that no statute provided for a derivative suit mechanism on behalf of nonprofit corporations, and no such mechanism had been definitively established by the courts, the *Flores* court declined to recognize any right to a derivative suit mechanism by the nonprofit corporation's members. *But see Mitchell*, 60 S.W.3d at 128 (citing *Wingate*, 795 S.W.2d at 719 (Tex. 1990) for proposition that "an owner cannot personally recover damages for a wrong done solely to the corporation, even though the owner may be injured by that wrong").[15] The Court notes that at times courts apply general corporate law to Texas nonprofit corporations. However, given the *Flores* court's definitive (and fairly recent) statements regarding the inapplicability of corporate law governing for-profit corporations to nonprofit corporations, specifically the derivative suit mechanism, this Court declines to fthaind that members of nonprofit corporations are limited to

---

[14] The *Flores* case concerned claims brought by members of a tax cooperative against the cooperative, which was created under the Texas Cooperative Association Act ("TCAA") and was subject to the Texas Non-Profit Corporation Act ("TNCA") to the extent the TNCA's provisions did not conflict with the TCAA. The *Flores* court explained that "[b]ecause it is thus governed by the Texas Non-Profit Corporation Act, the Business Corporation Act does not apply to [the cooperative]." (citing *Wingate*, 795 S.W.2d at 719); *see also Myer v. Cuevas,* 119 S.W.3d 830, 835 (Tex. App–San Antonio 2003) (Texas Condominium Act grants right to council of owners to institute litigation on behalf of two or more apartment owners concerning a matter related to the common elements, but does not confer standing on owner to sue individually to recover proportionate share of damages for injury done to the common elements).

[15] *Mitchell* later explained that "recovery for damages done the common areas belong solely to [homeowners'] association, and to sue for those damages, the Owners were required to bring a representative suit on behalf of the corporation." (citing *Wingate*, 795 S.W.2d at 719); *see also Myer v. Cuevas,* 119 S.W.3d 830, 835 (Tex. App–San Antonio 2003) (Texas Condominium Act grants right to council of owners to institute litigation on behalf of two or more apartment owners concerning a matter related to the common elements, but does not confer standing on owner to sue individually to recover proportionate share of damages for injury done to the common elements).

derivative suits in order to assert claims based on harms done to the corporation.[16] As such, the

Court finds that dismissal of Plaintiffs' RICO claims based on the standing analysis set forth in

*Joffroin* is not warranted at this time.

>   ii.    Standing: Breach of Fiduciary Duty Claim

Double Diamond has argued that Plaintiffs have no standing to assert breach of fiduciary

duty claims against Ward and Curran because 1) directors of corporations only have fiduciary duties

to the corporations for which they serve, and 2) claims for breach of fiduciary duty must be raised

by the corporation. Thus, in their view, only the property owners' association may raise this claim

against them.[17] This Court previously found that Plaintiffs sufficiently alleged standing to assert

breach of fiduciary duty claims against Defendants Ward and Curran, explaining:

> Because Plaintiffs have asserted injury to themselves and do not bring derivative
> claims on behalf of the WBPOA, the Court cannot conclude that they lack standing.
> Defendants have not met their burden of showing that such claims are foreclosed
> under Texas law.

---

[16] In support of their argument that Texas law does not provide that the sole cause of action resides in the homeowners' association, Plaintiffs state that under Texas law, a property owners' association may not assert claims unless a member of the association has standing individually. The cases cited by Plaintiffs do not in fact set forth such a rule but merely establish that an association, if suing *on behalf of its individual members*, only has standing if individual members have standing. In other words, if an association is going to stand in the shoes of its members, it cannot assert claims that the individual member could not assert. *See, e.g., Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 447 (Tex. 1993) (adopting test set forth in *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977), which explains that "an association has standing to sue on behalf of its members when," *inter alia*, "its members would otherwise have standing to sue in their own right"); *see also Wilchester W. Concerned Homeowners LDEF, Inc., v. Wilchester W. Fund, Inc.*, 177 S.W.3d 552, 561 (Tex. App.–Houston 2005) (where homeowners' organization brought action against homeowners' association and adjacent recreation club seeking declaratory judgment voiding amendments to deed restrictions, organization could bring suit and was not required to join all homeowners, as organization "has alleged that its members have suffered an injury as a result of the actions taken by the [homeowners' association], and thus its members would be able to bring suit in their own right") (citing, *inter alia*, *Tex. Ass'n of Bus.*, 852 S.W.2d at 447-48).

[17] Ward and Curran also assert that they breached no fiduciary duty, even if the individual property owners did have standing to assert a breach of fiduciary claim.

Mem. Op. May 10, 2010 at 24. The Court therefore denied Defendants' Motion to Dismiss to the extent that it sought dismissal of the fiduciary duty claims based on standing.[18] The Court declines to disturb this finding at this time.[19] Further, even if Plaintiffs' claims were more properly construed as asserting claims based on harm to the property owners' association, the Texas Non-Profit Corporations Act does not provide a derivative suit mechanism that would allow White Bluff property owners to assert claims against Ward and Curran on behalf of the property owners' association. Without such a mechanism, and if the individual property owners are not found to have a individual cause of action against these directors, it would be impossible for anyone to assert breach of fiduciary duty claims against directors violating this duty, if the directors do in fact, as alleged here, control the property owners' association board.[20]

B.    *Class Certification*

Although the parties dispute whether the proposed class meets the requirements of Rule 23(a) and the superiority requirement of Rule 23(b)(3), the bulk of their dispute concerns whether the proposed class meets the predominance requirement of Rule 23(b)(3), *i.e.*, the requirement that

---

[18] The Court dismissed the fiduciary duty claims to the extent they sought recovery under Section 32.45 of the Texas Penal Code.

[19] The Court notes that Double Diamond generally cites cases applying Texas corporate law applicable to for-profit corporations in support of its argument that Bridgewater may not assert fiduciary claims against it. Given the *Flores* court's statement that no derivative mechanism exists for nonprofit corporations, the Court declines to dismiss the fiduciary claims based on standing at this time. *But see Myer v. Cuevas*, 119 S.W.3d 830, 836 (Tex. App–San Antonio 2003) (property owner could not assert fiduciary duty claim against property owners' association board unless he alleged that a fiduciary duty was owed to him personally by the officers, as right to proceed against officer of corporation for breaching fiduciary duty owed to corporation belongs to the corporation) (citations omitted).

[20] The Court expresses no opinion at this time as to whether Curran and Ward did in fact violate any duty to the property owners' association or Plaintiffs, nor as to whether Curran and Ward do and did control the property owners' association board.

common issues predominate over individual issues. Because the Court finds the Rule 23(b)(3) inquiry dispositive, the Court assumes, without deciding, that the Rule 23(a) requirements have been met.

Plaintiffs claim that the following issues are common to the class and would predominate at trial: "(1) whether the fees and assessments levied by the WBPOA are illegal; (2) whether Double Diamond owners/executives Ward and Curran, as directors of the WBPOA, have breached their fiduciary duties; (3) whether Defendants have been unjustly enriched; and (4) whether injunctive relief is warranted." Mot. 3-4. As explained by Plaintiffs:

> The central issue in this litigation is the fees and assessments levied by the WBPOA Board of Directors against the property owners at White Bluff. . . . The claims alleged by the class – RICO, breach of fiduciary duty, collateral estoppel, unjust enrichment, constructive trust, and a request for injunctive relief – all focus on the same questions of fact and law. Showing that Defendants, through the use of mail and wire, engaged in an ongoing pattern of making false statements about the need for the assessments, and then soliciting, collecting and using the funds improperly for their benefit, are all common issues, regardless of who the class member is. The fiduciary duties owed by WBPOA directors Ward and Curran are owed to the entire class, as they have been directors of the WBPOA for the entire class period, and all proposed class members are members of the WBPOA. If the fees are improperly assessed, then Defendants' failure to make restitution is a uniform issue. Finally, the injury here is common to all class members, who would each be entitled to a monetary recovery or receivable reduction calculated by a straightforward, uniform formula.
>
> Not only do common issues predominate Plaintiffs' affirmative claims, but Defendants cannot successfully defeat class certification by arguing that individual issues predominate either the affirmative defense of limitations or the elements of a RICO claim.
>
> First, the issue of whether the applicable statues of limitation are tolled by the doctrine of fraudulent concealment is common, because that inquiry focuses on Defendants' conduct, which is common to the whole class and can be proved by evidence common to all class members. Further, the fact that different limitations may apply to different causes of actions does not defeat certification, as courts routinely find that common issues predominate even when multiple statutes of limitations apply. In this case, the Court will not have difficulty applying the two applicable statutes of limitations, and the time of their accrual will be established by evidence common to the entire class.

Next, because reliance is not an element of RICO, and the class has not asserted a fraud claim, there is no reliance argument that requires individualized proof, which may otherwise defeat predominance. Here, the class challenges the legality of the WBPOA Board of Directors forcing property owners to participate in the Food and Beverage program as well as assessing any maintenance fee that is not related to association property or not competitively bid or otherwise part of a fair, arm's length transaction. The dispute is with the fee itself, not whether the class members relied on any misrepresentations in paying it.[21]

*Id.* at 7-8 (citations omitted).

In response, Double Diamond argues that individual issues predominate over issues common to the

class:

Plaintiffs have not shown that common issues predominate over issues requiring individualized proof as to each class member as required by Rule 23(b)(3). In short, this is a RICO fraud case. It is based on alleged misrepresentations by Defendants concerning White Bluff's hospitality program and golf course maintenance fees. Yet Plaintiffs have not shown — or even attempted to show — how they could prove, on a class-wide basis, with class-wide proof, that each of the thousands of White Bluff property owners, who bought and sold property in White Bluff from Defendants and various others over the course of many years, were defrauded by Defendants.

Without class-wide proof, each putative class member would need to submit individualized proof — thereby creating the need for thousands of mini-trials — about, for example: what he or she received and read or heard, what he or she thought it meant, what he or she already knew about White Bluff's programs and fees, and how, if at all, a Defendant's statement affected his or her action or conduct. Thousands of individual mini-trials on liability would, if successful, then be followed by potentially thousands more on damages.

And that is only one side of the equation. In their defense, Defendants would present evidence about the different dates on which limitations began to run on a given owner's various claims and the extent to which an individual owner's claim for harm or injury should be offset or reduced due to the various benefits (e.g. usage of

---

[21] Plaintiffs also discuss, in connection with their arguments regarding predominance, that due to the relatively small amount of money assessed to each property owner, individual litigation is "economically unfeasible" and "a class action is a more efficient mechanism for adjudication." Mot. 7. It is not clear how the amount of money at stake is relevant to the issue of predominance, even if it is true that individual litigation is in fact "economically unfeasible." Further, although this contention is repeatedly emphasized throughout Plaintiffs' briefing and their arguments at the class certification hearing, such argument, even if accepted by the Court, is not sufficient to meet Plaintiffs' burden under Rule 23, if the requirements of Rule 23 such as predominance are not met.

free golf rounds; sale or redemption of hospitality credits; added value to one's property caused by the amenities and realized upon sale) realized by the owner. This ocean of individualized evidence would swamp this litigation and make the case unmanageable.

Defs.' Opp'n 4-5 (citations omitted). In analyzing the parties' arguments on predominance, the Court focuses on the RICO claims and damages.

i.    RICO Claims

Double Diamond argues that class certification is not appropriate for Plaintiffs' RICO claims due to the reliance that must be shown as to each class member, specifically each class member's reliance on Double Diamond's alleged misrepresentations. Plaintiffs argue in contrast that they need not show reliance given that the predicate act is RICO mail fraud, relying on the Supreme Court's statements in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008). The Court now revisits its prior findings regarding RICO mail fraud and reliance based on *Bridge*. The Court previously found, in the context of Defendants' Motion to Dismiss that:

> [RICO] confers standing on any person injured in his business or property by reason of a violation of section 1962 of this chapter. Plaintiffs are not required to plead that they relied on the allegedly fraudulent material; rather they are only required to allege that they were injured "by reason of" commission of the predicate acts.

Mem. Op. May 10, 2010 at 22 (citing *Bridge* and 18 U.S.C. § 1964(c)). This Court therefore found that Plaintiffs had standing to assert their RICO claims given that they asserted their own injuries apart from any injury to the WBPOA. *Id.* at 23. Upon further examination of *Bridge* and relevant Fifth Circuit case law, the Court concludes that Plaintiffs, and all members of the potential class, must establish their individual reliance on the allegedly fraudulent representations in order to

recover for RICO mail fraud.[22] The Supreme Court's discussion in *Bridge* is instructive. In *Bridge*,

disappointed bidders in a municipal auction alleged RICO mail fraud violations by defendants,

bidders who made fraudulent representations to the municipality, enabling the defendants to

purchase property that the plaintiffs sought. The court rejected the defendants' contention that

proximate cause for fraud claims can only be shown where the plaintiff can demonstrate that he

relied on the misrepresentation. The court explained reliance was not an element of RICO mail

fraud nor essential to showing causation:

> Petitioner's argument is twice flawed. First . . . the predicate act here is not common-law fraud, but mail fraud. Having rejected petitioners' argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim. Reliance is not a general limitation on civil recovery in tort; it is a specialized condition that happens to have grown up with common law fraud. That "specialized condition," whether characterized as an element of the claim or as a prerequisite to establishing proximate causation, simply has no place in a remedial scheme keyed to the commission of mail fraud, a statutory offense that is distinct from common-law fraud and that does not require proof of reliance.
>
> Second, while it may be that first-party reliance is an element of a common-law fraud claim, there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it.

*Bridge*, 553 U.S. at 655-56 (citations omitted). Plaintiffs rely on this portion of the *Bridge* opinion

in support of their contention that they need not establish reliance for each class member. However,

the Supreme Court continued to explain that generally plaintiffs will have to establish their own

---

[22] Aside from *Bridge*, Double Diamond cites to the Fifth Circuit's pattern jury instruction on RICO mail fraud, which implies that plaintiffs must be deceived by the defendants' scheme to defraud, thus imposing a reliance requirement on Plaintiffs' RICO mail fraud claim. Hr'g Tr. Feb. 15, 2011 at 35-36 (discussing Fifth Circuit Pattern Jury Instructions – Civil 2006 at § 8.1, found at http://www.lb5.uscourts.gov/juryinstructions/fifth/2006civil.pdf (last visited April 12, 2011)). Given that the Fifth Circuit's jury instructions on RICO have not been updated since 2006, before the *Bridge* case was decided, the Court does not base its findings regarding the requirement of reliance in RICO mail fraud claims on the pattern jury instruction.

reliance in order to establish RICO mail fraud:

> Of course, none of this is to say that a RICO plaintiff who alleges injury "by reason of" a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation. . . . Accordingly, it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation. . . . Proof that the plaintiff relied on the defendant's misrepresentations may in some cases be sufficient to establish proximate cause, but there is no sound reason to conclude that such proof is always necessary. By the same token, the absence of first-party reliance may in some cases tend to show that an injury was not sufficiently direct to satisfy § 1964(c)'s proximate cause requirement, but it is not in and of itself dispositive. A contrary holding would ignore *Holmes'* instruction that proximate cause is generally not amenable to bright-line rules.

*Bridge*, 553 U.S. at 658-59 (citing, *inter alia*, *Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258 (1992) (emphasis in original); *see also id.* at 657 n.6 (a "misrepresentation can cause harm only if a recipient of the misrepresentation relies on it").

As read by this Court, *Bridge* does not establish the bright-line rule that plaintiffs asserting RICO claims based on mail fraud need not assert or establish their reliance on the fraud. *Bridge* focused primarily on whether the plaintiffs, who did not in fact rely on any misrepresentations by the defendants, may still assert RICO mail fraud claims based on alleged misrepresentations that were relied upon by a nonparty to the suit, leading to the plaintiffs' injury. In essence, the Supreme Court found that in most cases, plaintiffs will either have to show third-party reliance or first-party reliance.[23] Plaintiffs cite cases in support of their contention that no showing of reliance is necessary

---

[23] *See, e.g., Braswell Wood Co. v. Waste Away Group, Inc.*, 2010 WL 3168125, at *3 n.1 (M.D. Ala. Aug. 10, 2010) ("*Bridge* abrogated the Eleventh Circuit's precedent . . . only narrowly in deciding that a RICO claim may proceed on the basis of 'third-party' reliance; that is, when a plaintiff alleges that it was harmed because a third party relied on the defendant's misrepresentations. *Bridge* did not hold that no reliance on anyone's part is required to sustain a RICO claim with a fraud predicate.") (citations omitted).

to show causation in this case, but the Court disagrees with these cases to the extent that they may assert that no showing of reliance by any party is necessary for RICO mail fraud claims.[24]

Here, Plaintiffs do not claim third-party reliance and it is not clear how they may show causation without first-party reliance. Plaintiffs argue that the homeowners' payment of their assessments shows that they relied on the truthfulness of the invoices setting forth the assessments. *See, e.g.*, Pls.' Reply 4 ("[I]it is logical to assume that, given the millions of dollars received each year from property owners in assessments as well as Defendants' practice of initiating foreclosure proceedings against those who do not pay, property owners are induced to believe that they must pay for these assessments."). However, such theory does not obviate the need to show the individual class members' reliance.[25] A similar "invoice theory" was found inappropriate to show causation for the purposes of class certification in *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*, 319 F.3d 205 (5th Cir. 2003). As set forth in *Sandwich Chef*, the plaintiffs alleged that "each class member was overcharged by means of an inflated invoice that affirmatively misrepresented that the premium charged was the amount lawfully due," and "[i]ndividual proof of reliance was not an obstacle to class certification because the act of payment of invoices could

---

[24] Plaintiffs cite to, *inter alia*, *Kennedy v. Jackson National Life Insurance Co.*, 2010 WL 2524360 (N.D. Cal. June 23, 2010); *Charron v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221 (S.D.N.Y. 2010); and *Spencer v. Hartford Financial Services Group, Inc.*, 256 F.R.D. 284 (D. Conn. 2009). Even if these cases were binding upon the Court, it is not clear that they establish that plaintiffs need not establish first- or third-person reliance in order to prove causation.

[25] Notably, this assertion and Plaintiffs' assertions that "individual issues of reliance do not thwart class actions" and "a court can presume reliance," Pls.' Reply 4, conflicts with Betty Bridgewater's statement that she believed the food and beverage credit was illegal from the beginning. At least one other class member, Daniel Saturn, appears to have had similar beliefs at an early stage as well. While perhaps the majority of the class members did not have similar beliefs, the fact that one of the lead plaintiffs claims that she knew one of the programs at issue was illegal certainly calls into doubt any presumption of reliance by all class members.

establish circumstantial evidence of reliance." *Id.* at 220. The defendants argued that the plaintiffs were aware that they were being charged unlawful rates, and such knowledge, if found, "would eliminate reliance and break the chain of causation." *Id.* (citations omitted). The trial court had found that plaintiffs could present circumstantial evidence "consist[ing] of proof that the invoices contained material misrepresentations – inflated premiums – and that the class members had paid overcharges in reliance on the invoices," as well as "expert witness testimony that businesses customarily and reasonably rely on the accuracy of invoices . . . and that commercial transactions between businesses occur based on an ethic of honesty and fair dealing." *Id.* (citations omitted). The Fifth Circuit rejected this finding, explaining that the plaintiffs "must establish at trial that they detrimentally relied on the misrepresentations in the invoices" and explaining that the defendants were entitled to submit proof demonstrating a lack of reliance by individual plaintiffs. *Id.* at 220-21. Accordingly, the court found that the invoice theory set forth by the plaintiffs did not "eliminate individual issues of reliance and causation that preclude a finding of predominance of common issues of law or fact."[26] *Id.* at 221.

      Under similar reasoning the Court finds that individual class members must establish their

---

[26] Plaintiffs argue that *Sandwich Chef* is no longer good law, relying on *Bridge* and *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009). *St. Germain* explained:

> In holding that Appellants were required to demonstrate detrimental reliance when alleging injuries that resulted from fraud under RICO, however, the district court relied on Fifth Circuit precedent that is no longer good law [citing *Summit Props. Ins. v. Hoechst Celanese Corp.*, 214 F.3d 566, 562 (5th Cir. 2000)]. The Supreme Court recently held [in *Bridge*] that no reliance element exists for civil causes of action under RICO for victims of mail fraud. Thus, *to the extent that our prior cases are in conflict with Bridge*, they are overruled.

556 F.3d at 263 (emphasis added). The Court agrees that *Sandwich Chef* is overruled to the extent that it precluded assertion of RICO claims based on third-party reliance. However, *Bridge* makes no findings which would overrule *Sandwich Chef's* findings rejecting the invoice theory of reliance.

reliance in order prove their RICO mail fraud claim. Given that the Court would be required to conduct mini-trials as to the issue of individual reliance as to each class member,[27] Plaintiffs cannot establish that common issues would predominate at trial and cannot establish superiority under Rule 23(b)(3) as to Plaintiffs' RICO mail fraud claims. As such, the Court **DENIES** class certification with respect to Counts One (18 U.S.C. § 1962(c)) and Two(18 U.S.C. §1962(d)), given that they are based on the predicate acts of RICO mail and wire fraud. *See* FAC ¶¶ 91-92, 95.

   ii.   Claims for Relief/Remedies

Class certification may be inappropriate due to the predominance of individualized damages determinations over common issues. *O'Sullivan*, 319 F.3d at 744-45 ("Where the plaintiffs' damages claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried.") (citing *Allison*, 151 F.3d at 419; *Castano*, 84 F.3d at 745 n.19). Double Diamond argues that common issues do not predominate in this case due to the individual damages determinations that will be required, preventing class certification. Specifically, Double Diamond

---

[27] As explained by Double Diamond, the Court would need to examine :

1) What allegedly false statement was received by the individual property owner?
2) What did the individual property owner understand the statement to mean?
3) What did the individual property owner already know about the substance of the statement?
4) What did the property owner do, if anything, in response to the statement?
5) How was the individual property owner proximately injured, if at all, by the allegedly false statement?

Defs.' Br. Opp'n 12. Without expressing an opinion regarding to what extent each class member would need to answer these questions, the Court finds that each class member would need to show his or her reliance on whatever misrepresentations were made by Double Diamond. The Court also notes that Double Diamond disputes that uniform representations were made to each class member, which also tends to negate a finding of predominance of common issues. *Id.*

argues that any possible damages award class members receive must be reduced by the value of benefits they received, specifically the value of the free rounds of golf and food and beverage credits they used or sold to other property owners. Double Diamond argues that due to the lack of record keeping by the homeowners' association or the corporations providing the various amenities at White Bluff, this information is solely within the control of the class members and therefore damages will have to be determined on an individual basis. In contrast, Plaintiffs argue that no "offset" is necessary because 1) these assessments are illegal and 2) under accounting principles they are not "benefits" as the property owners "didn't have a choice of whether to receive it or not." Hr'g Tr. 25-26; Pls.' Reply 5.

The Court is aided in its determination of whether "offsets" are necessary by a recent decision of the Dallas Court of Civil Appeals in the related state case *Double Diamond, Inc. and White Bluff Property Owners' Association v. Daniel Saturn*, --- S.W.3d ----, 2011 WL 1240096 (Tex. App–Dallas Apr. 5, 2011). Double Diamond and the WBPOA ("the Appellants") sought, *inter alia*, unpaid food and beverage assessments from Daniel Saturn, a property owner at White Bluff, as well as a declaratory judgment that the food and beverage program was proper and in accordance with the WBPOA bylaws, and that Saturn, as a member of the WBPOA, was subject to the program. *Id.* at *2. Saturn asserted counterclaims seeking a declaratory judgment that the food and beverage program was illegal and seeking an injunction barring the Appellants from assessing future food and beverage assessments, foreclosing on his lot, or making negative credit reports against him for refusing to pay the charges. *Id.* at *2. The court found that the Appellants failed to conclusively establish that the food and beverage assessments were reasonable compensation for services rendered to the WBPOA by the receiving Double Diamond entity Club Corp. *Id.* at *5. The court reasoned

that the jury could find that the funds paid to Club Corp. were not reasonable compensation based on evidence that Double Diamond had agreed to make a million dollars' worth of capital improvements to the resort that would have otherwise been paid by the WBPOA, but would also be relieved of a $50,000 annual payment to the WBPOA and would receive over $11 million in food and beverage funds over 10 years in exchange for $1 million in capital improvements. *Id.* The court implied that the determination of whether the compensation was reasonable would necessarily involve weighing the benefits received by the property owners in the form of food and beverage credits used against the compensation received by Club Corp. in the form of food and beverage assessments:

> Although *the members of the Owners' Association received benefits totaling the amount of the food and beverage credits they actually used,* there was no evidence as to that amount. And although the value of the lots of the Owners' Association's members might be increased by the presence of Club Corp.'s hospitality operations, there was no evidence as to the amount of such property-value increases. These facts constitute some evidence that the food and beverage funds paid by the Owners' Association to Club Corp. were not reasonable compensation for services rendered to the Owners' Association by Club Corp.[28]
>
> Thus, Appellants failed to conclusively establish that the food and beverage charges paid to Club Corp. were reasonable compensation for services rendered to the Owners' Association by Club Corp.

*Id.* (emphasis added); *see also id.* at *7 ("In this case, the jury made no findings in support of any element of appellee's declaratory judgment claim, and lack of reasonable compensation was not conclusively established because the food and beverage credits themselves constituted some evidence of reasonable compensation."). The appellate court found that a reasonable jury could find that the

---

[28] Although this issue was not discussed by the trial court or the appellate court, neither court appeared concerned that payments by the property owners were used to support non-association property. Rather, the key issue was whether the food and beverage program assessments received by Club Corp. were reasonable compensation for the food and beverage credits given and/or used.

assessments were not reasonable compensation in part due to the fact that the Appellants had not produced evidence on the amount of credits actually used.[29] However, in the instant case, Plaintiffs have the burden of showing their damages in addition to Double Diamond's liability. Also, for the purposes of class certification, Plaintiffs have the burden of showing that class certification is appropriate and that individual damages issues do not predominate over common issues. Given that the appellate court found that any determination of what constituted "reasonable compensation" to the Double Diamond entities would have to include the value of food and beverage credits actually used by the members, the Court similarly finds that any calculation of individual class members' damages must also take in account the value of benefits received, specifically the free rounds of golf and food and beverage credits received and exercised or transferred to others. The Court is mindful of the fact that at least some class members claim they were forced to pay the assessments and that they did not in fact receive benefits equal to the dollar amount of credits they received. However, the Court is also mindful of the fact that the homeowners did receive food and beverage credits and free rounds of golf which have a monetary value greater than zero, if not equal to the amount of the credit or the normal cost of a round of golf at White Bluff,[30] and these benefits

---

[29] The court explained that the jury made "an affirmative finding that appellants did not carry their burden of proof to show the food and beverage program complied with the bylaws because the charges constitute reasonable compensation, but it is *not* an affirmative jury finding that [Saturn] carried his burden of proof to show that the food and beverage program violated the bylaws because the charges did not constitute reasonable compensation." *Id.* at *7 (emphasis in original). The court therefore reversed the trial court's declaratory judgment that the food and beverage program was not in accordance with the bylaws and that it violated article 1396-2.24 of the Non-Profit Corporations Act based on the jury's findings. *Id.*

[30] These more readily quantifiable benefits are also in addition to whatever benefits the homeowners may have enjoyed due to maintenance of the amenities supported by the assessments such as increased property values, though Plaintiffs argue that Double Diamond was contractually obligated to provide and maintain these amenities.

should be deducted from the assessments paid by each class member in order to determine that member's damages.[31]

Plaintiffs argue that even if offsets are required to be deducted from each class member's individual damages, "Defendants maintain records showing usage of credits," and then a fair market value should be attributed to those credits, and "whatever amount was used by a property owner would be deducted from the award to that particular property owner." Pls.' Reply 5. In response to Double Diamond's contention that they did not track food and beverage credit usage until 2006, preventing a uniform damages calculation, Plaintiffs argue that "[i]t would not be Plaintiffs' burden, and therefore should not be Plaintiffs' problem, to have to consider how to recreate credit usage." *Id.* at 5 & n.5. While perhaps Double Diamond should have kept records of credit usage and use of the free rounds of golf, such omission does not relieve Plaintiffs of their burden to show that certification is warranted and that individualized issues do not predominate over common issues.[32] *See*, *e.g.*, *Castano*, 84 F.3d at 740 (plaintiff has burden of proof to show that class should be certified). Due to the lack of this information, each class member's damages would have to be calculated on an individual basis using individualized proof,[33] thus defeating Plaintiffs' claims of predominance of

---

[31] To refund the full amount of assessments paid could result in windfalls to class members who did in fact take at least partial advantage of their credits.

[32] The cases cited by Plaintiffs in support of their assertion that no offsets are required are neither binding on this Court nor on point. Further, Plaintiffs' claims that failure to track food and beverage credit usage "underscores what an illusory 'benefit' this program really is," Pls.' Reply 5-6, is more appropriate to the merits of the case and not whether their claims are appropriate for class certification.

[33] As explained by Double Diamond,

[E]ach property owner would have to be questioned about their credit usage and documents potentially establishing such usage would be, if at all, in the possession of the individual property owner. Similarly, except as may have been kept by an individual owner, records

class issues and superiority of the class action mechanism. Accordingly, the Court finds that class certification as to damages is inappropriate and is hereby **DENIED**.

Further, the Court declines to sever, *sua sponte*, the issues of liability of the remaining potential class claims from the issues of damages. The Court declines to sever these issues given the Court's requirement to consider the cause of action as a whole and the Fifth Circuit's instruction not to "manufacture predominance through the nimble use" of Federal Rule of Civil Procedure 23(c)(4). *Castano*, 84 F.3d at 745 n.21. Further, Plaintiffs have not sought, as an alternative to certification of both liability and damages, to certify the issue of liability only as to each claim in the face of Double Diamond's arguments that individual determinations must be made as to each class member's damages. Given that the Court declines to sever the issue of damages, Plaintiffs' request for certification of Counts Three (reimbursement),[34] Four (breach of fiduciary duty), and Six (unjust enrichment)[35] is **DENIED**.[36]

---

tracking the amounts received by property owners for their sale of hospitality credits do not exist. Likewise, evidence of other benefits received an enjoyed by an individual, like usage of the free rounds of golf and purchase of discounted merchandise and services is in the possession, if at all, of each individual property owner.

Defs.' Br. Opp'n 17.

[34] Based on the Court's reading of the appellate court's decision in *Double Diamond, Inc. v. Saturn*, 2011 WL 1240096, it is not clear that there is any determination by the trial court or now the appellate court which Plaintiffs may use for collateral estoppel purposes, given that apparently the only relevant finding left after appeal is that Double Diamond did not establish its right to collect on the food and beverage credit assessments in that particular case. Notably, the appellate court reversed the trial court's finding that assessments received by Double Diamond were not reasonable compensation for the goods and services provided by the Double Diamond entity, and that the food and beverage assessments were void *ab initio*. However, the parties dispute the effect of the appellate court's determination, and the Court declines at this time to determine what collateral estoppel effect the trial court's and appellate court's determinations may have, if any.

[35] Even if there were uniform damages issues as to Plaintiffs' unjust enrichment claim, individualized determinations of liability as to this claim would predominate. "A party may recover under the unjust

30

Plaintiffs also seek certification of their "counts" requesting injunctive relief and imposition of a constructive trust.[37] Given that the Court declines to certify any underlying legal or equitable claims upon which these remedies may be based, the Court **DENIES** certification as to Counts Five and Seven.

## V.

## CONCLUSION

For the reasons discussed in this order, Plaintiffs' proposed Class does not meet the predominance requirements of Rule 23(b)(3). Plaintiffs' Motion for Class Certification is therefore

---

enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *see also First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.–Dallas 2005, no pet.). Therefore each class member would be required to show that they paid their assessments because of Double Diamond's fraud, duress, or taking of an undue advantage. Further, Double Diamond would be able to assert the defense of waiver. "Under Texas law, waiver is a voluntary, intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *First Interstate Bank of Ariz. N.A. v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir.1991). Whether a waiver occurred ordinarily involves a fact question focusing on intent. *See F.D.I.C. v. Niblo*, 821 F. Supp. 441, 451 (N.D. Tex.1993). While the Court expresses no opinion on whether Double Diamond has a valid defense of waiver, it notes that determining whether class members waived any rights will require individualized determinations in which Double Diamond would be able to submit evidence as to particular class members and which Plaintiffs could rebut. As with Plaintiffs' RICO claims, assertion of an invoice theory will not suffice to show that Plaintiffs relied on any misrepresentations nor whether Plaintiffs waived or did not waive their claims.

[36] It is not clear that unjust enrichment and reimbursement are independent *claims*, rather than equitable *remedies*. *See, e.g., Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009) (While some courts applying Texas law "still occasionally refer to an 'unjust enrichment claim' . . . . [t]hese opinions do not, however, characterize unjust enrichment as a separate cause of action from money had and received; they consider it to be a general theory of recovery for an equitable action seeking restitution."); *see also id.* ("Texas courts of appeals have consistently held that unjust enrichment is not an independent cause of action, but is instead a theory upon which an action for restitution may rest.") (citations omitted). The Court did not reach the issue of whether unjust enrichment and reimbursement are proper claims rather than remedies in its Order of May 10, 2010 granting Defendants' Motion to Dismiss in part and denying it in part.

[37] Plaintiffs also seek exemplary damages and attorneys' fees, though those two forms of relief are not styled as "counts."

DENIED.[38]


      SO ORDERED.

      SIGNED: April 29, 2011.




                  JANE J. BOYLE
                  UNITED STATES DISTRICT JUDGE

---

[38] Because the Court finds that Plaintiffs do not meet their burden of showing predominance due to individualized issues regarding reliance and damages, the Court does not reach Double Diamond's argument that individualized issues regarding limitations predominate over common issues.